**UNITED STATES of America**

v.

**MIDLAND INDEPENDENT SCHOOL DISTRICT and Dr. James H. Mailey, Superintendent.**

**No. MO–70–CA–67.**

United States District Court,
W. D. Texas,
Midland-Odessa Division.

Oct. 21, 1971.

John F. Conroy, Atty., Department of Justice, Washington, D. C., for plaintiff.

Thornton Hardie, Jr., Midland, Tex., for defendant.

Garland Casebier, Midland, Tex., and Lawrence Fuller, Monahans, Tex., for intervenors.

GUINN, District Judge.

In this school case, the judicial power of this Court can be invoked only on a showing of discrimination violative of the constitutional standards declared in Brown v. Board of Education of Topeka, 374 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

"The constitutional command to desegregate schools does not mean that every school in every community must al-

ways reflect the racial composition of the school system as a whole." (Winston-Salem/Forsyth County Board of Education v. Catherine Scott et al., August 31, 1971, by the Chief Justice).

"We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from Brown I to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of Brown I to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination."

"Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools."

"The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation."

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554.

There have been four plans submitted to this Court, two by the School Board of the Midland Independent School District and two by the Intervenors. The Plaintiff in the case, the Department of Health, Education and Welfare, stated that these plans meet the constitutional requirements in so far as they relate to Negro children and the Court agrees with the Plaintiff on this point. Consequently, the decision of this Court is simplified,—which plan should be adopted rests entirely in the hands of the school board since this Court can not and would not take over the administrative functions resting in the discretion of school authorities.

The Defendant School District has stated that it approves the plan referred to as A-2. If it approves this plan and decides to put it into effect it may do so since it does not violate any of the constitutional standards required by the Supreme Court.

A different question is presented with regard to Mexican-American children since the record reveals that there has never been any *de jure* segregation of Mexican-American children, and that there is no evidence showing discrimination violative of the constitutional standards. Consequently, the plan of the Midland Independent School District relating to the De Zavala School is approved. The Plaintiff, Department of Health, Education and Welfare opposes the plan of the School District on this point.

To give the background of this case, the United States acting through its Department of Health, Education and Welfare, filed its complaint on August 7, 1970, in the Austin Division of the Western District of Texas, including as defendants the Texas Education Agency, the Midland Independent School District and six other school districts in the

Western District of Texas. Since the Midland Independent School District lies within the Midland-Odessa Division of the Western District of Texas, the case was transferred from Austin to the Midland-Odessa Division and severed from the other defendant school districts which remained in the Austin Division.

Hearings were held in El Paso, Texas, for pendente lite relief for the 1970–71 school year on August 24 and August 25, 1970. Testimony was presented at that time concerning the proposed plan of the United States and a defense by the School District of its proposed plan for the 1970–71 school year.

The United States complaint asserted that the school system was operating a dual system based on race and unless restrained by the Court the school district would continue to maintain and operate a dual system in violation of the constitutional rights of the Negro and Mexican-American children. At the hearings in El Paso on August 24 and 25, 1970, the plan of the Department of Health, Education and Welfare was fully developed and the action of the School Board after Brown I to eliminate the previous existing *de jure* segregation of Negro students was likewise fully developed.

The record from those hearings established that the School Board of the Midland Independent School District worked diligently with the segregation problem in attempting a desegregation plan which the School Board believed eliminated once and for all all vestiges of the dual system of education. The Court finds that the School Board acted consistently in good faith in preparing its plan in June of 1968 to eliminate all vestiges of the dual system of education in the school district. This plan was as follows:

### The Midland Plan

*Two High Schools:*

Midland High, fully integrated, is in the center of town and is fed by youngsters of all races and ethnic groups.

Lee High, fully integrated, is in the northwestern part of town and is fed by youngsters of all races and ethnic groups.

*Two Freshmen (Ninth Grade) Schools:*

Edison Junior High is in the southeastern part of town, is occupied by ninth grade students only, is fully integrated and is fed by youngsters of all races and ethnic groups.

Austin Junior High is in the northeastern part of town, is occupied by ninth grade students only, is fully integrated and is fed by youngsters of all races and ethnic groups.

*Three Seventh and Eighth Grade Junior High Schools:*

Alamo Junior High is in the western part of town, is occupied by seventh and eighth grade students only, is fully integrated and is fed by youngsters of all races and ethnic groups.

Goddard Junior High is in the northwestern part of town, is occupied by seventh and eighth grade students only, is fully integrated and is fed by youngsters of all races and ethnic groups.

San Jacinto Junior High is in the west-central part of town, is occupied by seventh and eighth grade students only, is fully integrated and is fed by youngsters of all races and ethnic groups.

*Nineteen Elementary Schools:*

All children of elementary age are assigned to neighborhood schools, each of which and all of which are located within easy-walking distance from the children's homes to which the respective child is assigned. These assignments are made without regard to race and are made strictly on a neighborhood zoning arrangement.

*Majority to Minority Provisions:*

Appropriate majority to minority provisions have been adopted by the District.

*Transportation:*

The need for transportation in the Junior High, Freshman and High School levels becomes apparent. Some fifty

buses owned and operated by the Midland District transport youngsters without cost to them to school if they reside two miles or more from their assigned building. Transportation is also provided for rural youngsters who request it.

*Staff, Facilities, Curriculum and Special Education Programs:*

The Midland District, as will be shown herein, has been especially proud of the manner in which it has been able to exceed all requirements regarding integration of staff, provision of facilities for its staff and pupils and installment of curriculum and special education programs that are in the best interest of education for those to whom they are furnished.

The Court further finds that in this plan the School authorities made "every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation."

The Court further finds that the racial concentration of Negroes and of Mexican-Americans in the 1968 Plan was not caused by public or private discrimination or state action but by economical factors and decisions of the Negroes and Mexican-Americans to live in their own neighborhood rather than in predominantly White neighborhoods.

Under the *Swann* decision and related cases, as stated above judicial power can be invoked only on a showing of discrimination violative of the constitutional standards declared in Brown v. Board of Education of Topeka, *supra,* and as declared in *Swann* and in Winston-Salem/Forsyth County Board of Education v. Catherine Scott et al., *supra,* on application to stay order of the Court of Appeals presented to the Chief Justice, "The Constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."

■ A school district has no affirmative obligation to achieve a balance of the races in the schools when the existing imbalance is not attributable to school policies or practices and is a result of the housing patterns and other forces over which the school administration had no control. School authorities have the primary responsibility for elucidating, assessing and solving the problems that have arisen from past *de jure* segregation.

The history of the Midland Independent School District does not reveal a deliberate resistance at any time of the Supreme Court's mandate to wipe out the dual system but to the contrary demonstrates desire and attempt to comply with the mandate. This is contrary to the conduct of many school districts which have resisted at every step, during the past 17 years, the court's mandates to set up a uniform system.

The record of the first hearings revealed complete acceptance by the School District of a unitary system and a desire to eliminate the dual system as promptly and practically as possible.

The government conceded that the original plan of 1968 would meet all requirements except as to one elementary all black school.

At the retrial of this case there were submitted two plans by the School Board relating to Negro children and two plans submitted by the Intervenors relating to Negro children, all of which plans were acceptable to the Department of Health, Education and Welfare.

So far as the Negro children are concerned this acceptance by the Health, Education and Welfare Department eliminates any action by the Court other than approving the plan the Board selects. This Court can only intervene in school matters where there is a showing of discrimination violative of the constitutional standards declared in Brown v. Board of Education of Topeka, *supra.*

■ This Court on reexamination of the record and of the *Swann* decision and of the opinion of the Chief Justice construing the *Swann* decision, finds that even the Plan of 1968 did not show discrimination violative of the constitution-

al standards referred to, nor do any of the four plans submitted, in the opinion of the Court violate any of the constitutional standards declared in Brown I.

Consequently, this Court can not take over the administrative functions of the School Board and decide which plan should be used.

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."

"By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228.

The School Board has stated that Plan A–2 is its choice and if it is the choice of the School Board this Court can not and will not substitute its personal feelings or preferences. Therefore, the Court will approve Plan A–2, which the School Board seeks to have approved, and direct that same be implemented and put in operation next school term.

In passing however, the Court would state that if the Court were required or permitted by law to perform the administrative function of selecting a plan from equally constitutional plans, the Court would not close either of the Negro elementary schools but would maintain them to carry out the neighborhood concept.

■ The Court commends the Intervenors for the interest shown and help given in this case and personally feels that their neighborhood schools should be left intact, but the failure of the school board to do this does not present a constitutional question. The Court feels that these neighborhood schools are very important to young children in the elementary grades and that it is not necessary in a unitary system and no good can be accomplished by eliminating the neighborhood school and sending young children long distances from their homes. The Court further feels and finds that the maintenance of these two neighborhood schools would in no wise militate against the unitary system of this school district, nor does the Court feel that additional busing of young children is needed to eliminate *de jure* segregation since there no longer exists *de jure* segregation. However, all of these are matters that the school board has the responsibility of passing upon and its discretion must be respected so long as its conduct in no wise violates the constitutional standards of Brown I.

■ The only question then actually before this Court in so far as the Department of Health, Education and Welfare is concerned, involves the De Zavala Elementary School. It is the position of the Department that this school is a vestige of a past dual system involving Mexican-Americans. The Court does not accept this nor does the record establish this. There has never been any *de jure* segregation of Mexican-American children and there has never been a dual system involving Mexican-Americans, and the Court so finds and the Court further finds that there has been no showing of any discrimination violative of the constitutional standards declared in Brown v. Board of Education of Topeka, *supra,* in so far as the Mexican-American children are concerned.

■ The Court finds from the evidence that the predominance of Mexican-American children in the De Zavala School was not caused by public or private discrimination or state action but by economic factors and the decision of the Mexican-Americans to live in their own neighborhood rather than in predominantly White neighborhoods and that the school board has acted consistently in good faith in this matter.

As Texas has never required by law that Mexican-American children be segregated and the Midland Independent School District has never enacted regu-

lations to this effect and from the evidence, the Court finds that there has been no history of discriminatory practices against Mexican-Americans by the school district. "We are concerned in these cases with elimination of discrimination inherent in dual school systems not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from Brown I to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of Brown I to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination."

"Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools." *Swann, supra.*

It is, therefore, ordered, adjudged and decreed that the Midland Independent School District implement its Plan A–2, copy of which is appended hereto and made a part hereof, so that same will be in operation next school term. The Plan submitted by the Defendant for the entire school district including the elementary schools, is hereby approved, being attached hereto and marked Defendants' Exhibit "G" filed in this cause, and this entire Plan shall be fully implemented and in operation by next school term.

It is further ordered that the school board of the Midland Independent School District shall file semi-annual reports during the school year similar to those required in United States v. Hinds County School Board, 5 Cir. 1970, 433 F.2d 611, 618–619.

## APPENDIX

### ELEMENTARY SCHOOL BOUNDARY DESCRIPTIONS

#### Plan A–2

*Bunche Elementary*

Begin at the intersection of Fairground Rd. and Indiana Street, west along Indiana to S. Benton, south on S. Benton to Washington Ave., west on Washington to S. Carver, south on S. Carver to Cloverdale Rd., west on Cloverdale Rd., to S. Lamesa Rd., south along the east side of S. Lamesa Rd., and its extension to I20, east on I20 to Fairground Rd., north on Fairground Rd. to E. Indiana.

Rural buses 4, 5, 6 and 9 serving that portion of Midland County east of State Highway 349 are re-routed from Travis to Bunche Elementary.

*Travis Elementary*

Begin at the intersection of S. Carver and E. Indiana, west on Indiana to the alley between S. Dallas and S. Terrell, south along that alley to its intersection with Griffin Avenue, west on Griffin to State Highway 349, south on Hwy. 349 to I20, east on I20 to the extension of S. Lamesa Rd., north along the east side of the extension of S. Lamesa Rd. and Lamesa Rd. to its intersection with Cloverdale Rd., east on Cloverdale to S. Carver and north on S. Carver to E. Indiana.

*South Elementary*

Begin at the intersection of Fairground Rd. and E. Hwy. 80, west on E. Hwy. 80 to Cotton Flat Rd., south on Cotton Flat Rd. to I20, east on I20 to State Highway 349, north on Hwy. 349 to Griffin Avenue, east on Griffin to the alley between S. Terrell and S. Dallas, north along that alley to E. Indiana, east on Indiana to S. Carver, south on Carver to Washington Aven., east on Washington to S. Benton, north on Benton to Indiana, east on Indiana to Fairground Rd., north on Fairground to E. Hwy. 80.

1970-71 SCHOOL BOUNDARY ZONE – MIDLAND, TEXAS

Plan A-2

Bus 4, 5, 6, 7

(see reverse side for grades 9 thru 12)

GRADES 1 THRU 6    GRADES 7 AND 8

compliments of

THE FIRST NATIONAL BANK OF MIDLAND

MEMBER FDIC

154

1970-71 SCHOOL BOUNDARY ZONE – MIDLAND, TEXAS

(see reverse side for grades 1 thru 8)

GRADES 10 11 AND NEW STUDENTS
TO LEE AND GRADE 12 TO MIDLAND
IN THIS AREA–GRADE 9 TO AUSTIN

GRADES 10,11 AND NEW STUDENTS
TO MIDLAND AND GRADE 12 TO LEE
IN THIS AREA GRADE 9 TO EDISON

GRADE 10 IN THIS
AREA TO MIDLAND
GRADE 9 TO EDISON

GRADE 10 IN THIS
AREA TO LEE
–GRADE 9 TO AUSTIN

GRADES 10 THRU 12

GRADE 9

compliments of

THE
FIRST
NATIONAL
BANK
OF MIDLAND
MEMBER FDIC

PLAN A–2 Revised Projections
Bunche Open with Rural Buses 4, 5, 6 and 9
Washington Closed

| BUNCHE | K (½ day) | 1 | 2 | 3 | 4 | 5 | 6 | SpEd | Total |
|---|---|---|---|---|---|---|---|---|---|
| Anglo | 9 | 20 | 26 | 27 | 25 | 23 | 23 | | 153 |
| Mexican | 5 | 4 | 6 | 2 | 7 | 6 | 4 | 4 | 38 |
| Negro | 17 | 21 | 22 | 17 | 22 | 23 | 21 | 7 | 150 |
| Total | 31 | 45 | 54 | 46 | 54 | 52 | 48 | 11 | 341 |
| **TRAVIS** | | | | | | | | | |
| Anglo | 8 | 19 | 24 | 26 | 25 | 22 | 21 | | 145 |
| Mexican | 26 | 22 | 35 | 28 | 34 | 28 | 21 | | 194 |
| Negro | 14 | 17 | 18 | 14 | 19 | 19 | 16 | | 117 |
| Total | 48 | 58 | 77 | 68 | 78 | 69 | 58 | | 456 |
| **SOUTH** | | | | | | | | | |
| Anglo | 13 | 24 | 33 | 37 | 31 | 28 | 31 | | 197 |
| Mexican | 21 | 18 | 30 | 23 | 27 | 24 | 17 | | 160 |
| Negro | 16 | 23 | 25 | 20 | 25 | 24 | 23 | | 156 |
| Total | 50 | 65 | 88 | 80 | 83 | 76 | 71 | | 513 |

DEFENDANT'S EXHIBIT G.

### MIDLAND INDEPENDENT SCHOOL DISTRICT
Midland, Texas

June 18, 1968
(Updated August 24, 1971)

In order to fully comply with Title VI of the Civil Rights Act of 1964, the Board of Trustees of the Midland Independent School District hereby proposes the realignment of attendance boundaries, the adoption of transportation and transfer policies, and the reassignment or professional personnel to achieve fully integrated staffing of the public schools at all levels.

The following objectives have been adopted as guiding principles:

Elimination of a dual school system in the Midland Independent School District beginning with the 1968–1969 school year by achieving racial integration at the secondary level so that no student body is composed of a majority of students of a minority race, applying the same criteria in assigning all pupils to attendance areas regardless of race or national origin.

Creation of secondary student bodies which are integrated.

Preservation of the elementary school as a neighborhood school.

Provision for equal educational opportunities for all children living in the Midland Independent School District regardless of race or national origin.

Elimination of those provisions in the current transfer policy which have resulted in the perpetuation of a dual school system in Midland.

Equalization of pupil loads in buildings so that no student is deprived of his educational opportunity because his school is overloaded or because his school is too small to offer a full elective program of courses.

Utilization of existing school buildings in the Midland Independent School District insofar as economically feasible.

I. *School Attendance Area Boundaries*

A. *Senior High Schools* (Grades 10, 11, and 12)

Effective August 30, 1971, the attendance area boundary between Lee and Midland High Schools begins on the east at the intersection of East Highway 80 and Fairground Road, west on East Highway 80 to Big Spring, north on Big Spring to Wadley Avenue, west on Wadley Avenue to Garfield, south

on Garfield to Gulf, west on Gulf to the alley between Ward and Hughes, north along that alley to Golf Course Road, west on Golf Course Road to Midkiff, south on Midkiff to West Highway 80, west on West Highway 80 to FM1369. With the exception of senior students residing in the transition area bound by a line beginning at the intersection of East Highway 80 and Lamesa Road, west on Highway 80 to Big Spring, north on Big Spring to Fiesta, east on Fiesta to Parkway Drive, east on Parkway Drive to Lamesa, south on Lamesa to East Highway 80; all students residing north of the high school attendance area boundary will attend Lee High School and all students residing south of that line will attend Midland High School. Beginning with the 1972–1973 school year, all high school transition zones will be phased out. Rural buses will transport high school pupils to Midland High School except for the area north of Midland served by Bus #27. Rural Bus #27 will transport senior high pupils to Lee High School.

B. *Junior High Schools*

The junior high school organizations will be divided structurally and administratively into two sections, (1) Grade 9 and (2) Grades 7 and 8.

1. Boundary line for Grade 9
   *Austin Junior High School*—Begin at the intersection of Fairground Road and East Highway 80, west on Highway 80 to Big Spring, north on Big Spring to Neely, west on Neely to Garfield, south on Garfield to Gulf, west on Gulf to the alley between Hughes and Ward, south along the alley between Hughes and Ward to Golf Course Road, west on Golf Course Road to Midkiff Road, south on Midkiff to Highway 80, west on Highway 80 to FM Road 1369, north on FM Road 1369 to the extension of Wadley Avenue, east along the extension of Wadley Avenue to FM Road 868, north and east on FM Road 868 to Park Road 269, east on Park Road 269 to Fairground Road, south on Fairground Road to Pine, east on Pine to Copus, south on Copus to Maple, west on Maple to Fairground Road, and south on Fairground Road to East Highway 80.

   *Edison Junior High School*—Begin at the intersection of Fairground Road and East Highway 80, west on Highway 80 to Big Spring, north on Big Spring to Neely, west on Neely to Garfield, south on Garfield to Gulf, west on Gulf to the alley between Hughes and Ward, south along the alley between Hughes and Ward to Golf Course, west on Golf Course to Midkiff, south on Midkiff to Highway 80, west on Highway 80 to FM Road 1369, south on FM Road 1369 to Interstate Highway 20, east on Interstate 20 to Fairground Road, and north on Fairground Road to Highway 80.

2. Boundary line for Grades 7 and 8
   *Alamo Junior High School*—Begin at the intersection of East Highway 80 and Fairground Road, west on Highway 80 to Midkiff Road, north on Midkiff Road to Golf Course Road, west on Golf Course Road to State Highway 158, west on State Highway 158 to FM Road 1369, south on FM Road 1369 to Interstate 20, east on Interstate 20 to Fairground Road, north on Fairground Road to East Highway 80.

   *San Jacinto Junior High School*—Begin at the intersection of Cowden Avenue and Fairground Road, west on Cowden to extension of Ft. Worth Avenue, south on Ft. Worth to Kansas, west on Kansas to Big Spring, north on Big Spring to Neely, west on Neely to Garfield south on Garfield to Gulf, west on Gulf to the alley between Hughes and Ward, south along the alley between Hughes and Ward to Golf Course, west on Golf Course to Midkiff Road, south on Midkiff

to Highway 80, east on Highway 80 to Fairground Road, north on Fairground to extension of Cowden Avenue.

*Goddard Junior High School*—Begin at the intersection of Park Road 269 and Fairground Road, west on Park Road 269 to FM Road 868, west and south on FM Road 868 to Wadley, west along the extension of Wadley Avenue to FM Road 1369, south on FM Road 1369 to State Highway 158, east on State Highway 158 to Golf Course Road, east on Golf Course Road to the alley between Hughes and Ward, north along the alley between Hughes and Ward to Gulf, east on Gulf to Garfield, north on Garfield to Neely, east on Neely to Big Spring, south on Big Spring to Kansas Avenue, east on Kansas to Ft. Worth, north on Ft. Worth and its extension to Cowden, east on Cowden and its extension to Fairground Road, north on Fairground Road to Maple, east on Maple to Copus, north on Copus to Pine, west on Pine to Fairground Road, north on Fairground Road to Park Road 269.

### C. *Elementary Schools*

Midland will maintain the neighborhood concept of the elementary school in the belief that the young child should be educated in an elementary school as close as possible to his home. The neighborhood school best serves the community in which it is located because the parents and school can work closer together for the education, safety, welfare, and happiness of the individual child.

Boundary lines for elementary schools.

*Bonham*—Begin at the intersection of Golf Course Road and Midkiff, west on Golf Course and State Highway 158 to Midland Drive, south on Midland Drive to Illinois, east on Illinois to Midkiff, north on Midkiff to Golf Course.

*Bowie*—Begin at the intersection of the extension of Pecos Avenue and FM Road 868, west on FM Road 868 to its extension of "H" Street, south along "H" Street and its extension to Neely, west on Neely to North "I," south on North "I" to Humble, west on Humble to Garfield, south on Garfield to Golf Course, east on Golf Course to North "L," south on North "L" to the alleyway between Princeton and Harvard, east along the alleyway between Princeton and Harvard to "G," south on "G" to Cuthbert, east on Cuthbert to "F," south on "F" to Louisiana, east on Louisiana to "B," south on "B" to Tennessee, east on Tennessee to North "A," south on North "A" to Ohio, east on Ohio to Big Spring, north on Big Spring to Scharbauer Drive, west on Scharbauer Drive to Pecos, and north on Pecos and its extension to FM Road 868.

*Bunche*—Begin at the intersection of Fairground Road and Indiana Street, west along Indiana to South Benton, south on South Benton to Washington Avenue, west on Washington to South Carver, south on South Carver to Cloverdale Road, west on Cloverdale Road to South Lamesa Road, south along the east side of South Lamesa Road, and its extension to Interstate 20, east on Interstate 20 to Fairground Road, north on Fairground Road to East Indiana.

Rural buses 4, 5, 6 and 9 serving that portion of Midland County east of State Highway 349 are re-routed from Travis to Bunche Elementary.

*Burnet*—Begin at the intersection of Midkiff Road and Park Street, west on Park to Tanner Drive, west on Tanner Drive to Raymond Road, south on Raymond Road to Thomason Drive, west on Thomason Drive to Midland Drive, south on Midland Drive to West Highway 80, west on Highway 80 to FM Road 1369, south on FM Road 1369 to Interstate 20, east on Interstate 20 to a point south of the intersection of West Wall and the Old Bankhead Highway, north to the intersec-

tion of West Wall and the Old Bankhead Highway, northeast on West Wall to the intersection of Midkiff, north on Midkiff to Park Avenue.

*Crockett*—Begin at the intersection of Golf Course Road and North Tyler Street, west along Golf Course to Big Spring, south on Big Spring to Kansas, east on Kansas to North Dallas, north on North Dallas to Garden Lane, east on Garden Lane to North Tyler, north on North Tyler to Golf Course Road.

*De Zavala*—Begin at the intersection of Cuthbert and Fairground Road, west on Cuthbert to Carver, south on Carver to Garden Lane, west on Garden Lane to Dallas, south on Dallas to Kansas, west on Kansas to Big Spring, south on Big Spring to Wall, east on Wall to Highway 80, east on Highway 80 to Fairground Road, north on Fairground Road to Cuthbert.

*Emerson*—Begin at the intersection of the extension of North "H" Street and FM Road 868, west and south on FM Road 868 to Wadley, east on Wadley to Midkiff, south on Midkiff to Neely, east on Neely to Whitney, north on Whitney to Dengar, east on Dengar to Ward, north on Ward to alley between Dengar and Shandon Avenue, east on that alley to Garfield, north on Garfield to Wadley, east on Wadley to North "H" Street, north on the extension of North "H" to FM Road 868.

*Fannin*—Begin at the intersection of the extension of North "H" and Wadley Avenue, west on Wadley to Garfield, south on Garfield to alley between Shandon and Garfield, west on that alley to Ward, south on Ward to Dengar, west on Dengar to Whitney, south on Whitney to Neely, west on Neely to Midkiff, south on Midkiff to Golf Course, east on Golf Course to the alleyway between Hughes and Ward, north along the alleyway between Hughes and Ward to Gulf, east on Gulf to Garfield, south on Garfield to Humble, east on Humble to North "I," north on "I" to Neely, east on Neely to the extension of North "H," north along the extension of North "H" to Wadley.

*Henderson*—Begin at the intersection of Midland Drive and Thomason Drive, west on Thomason Drive to FM Road 1369, south on FM Road 1369 to West Highway 80, east on Highway 80 to Midland Drive, north on Midland Drive to Thomason Drive.

*Houston*—Begin at the intersection of Garfield and Gulf, west on Gulf to the alleyway between Hughes and Ward Streets, south along the alleyway between Hughes and Ward to Golf Course, west on Golf Course to Midkiff, south on Midkiff to Andrews Highway, southeast along the Andrews Highway to Wall, east on Wall to North Big Spring, north on North Big Spring to Ohio, west on Ohio to "A" Street, north on "A" to Tennessee, west on Tennessee to "B," north on "B" to Louisiana, west on Louisiana to "F," north on "F" to Cuthbert, north on "G" to the alleyway between Princeton and Harvard, west on the alley between Princeton and Harvard to North "L," north on "L" to Golf Course, west on Golf Course to Garfield, north on Garfield to Gulf.

*Jones*—Begin at the intersection of State Highway 158 and Midland Drive, west on State Highway 158 to FM Road 1369, south on FM Road 1369 to Thomason Drive, southeast on Thomason to Midland Drive, north on Midland Drive to State Highway 158.

*Lamar*—Begin at the intersection of Andrews Highway and Wall, northeast along Andrews Highway to Midkiff, south on Midkiff to Wall, northeast on Wall to Andrews Highway.

*Long*—Begin at the intersection of Midkiff and Illinois, west on Illinois to Midland Drive, south on Midland Drive to Thomason Drive, southeast on Thomason Drive to Raymond Road, northeast on Raymond Road to Tanner, southeast on Tanner to Park, east on Park to Midkiff, north on Midkiff to Illinois.

*Milam*—Begin at the intersection of the extension of Carver Street and Park Road 269, west on Park Road 269 and FM Road 868 to the extension of

Pecos, south on the extension of Pecos and Scharbauer Drive, east on Scharbauer to North Big Spring, south on Big Spring to Golf Course Road, east on Golf Course to Tyler, north on Tyler to Scharbauer Drive, east on Scharbauer Drive to Carver, and north on Carver and its extension to Park Road 269.

*Pease*—Begin at the intersection of Park Road 269 and Fairground Road, west on Park Road 269 to the extension of Carver Avenue, south on the extension of Carver and Carver to Scharbauer Drive, west on Scharbauer to Tyler, south on Tyler to Garden Lane, east on Garden Lane to Carver, north on Carver to Cuthbert, east on Cuthbert to Fairground Road, north on Fairground Road to Maple, east on Maple to Copus, north on Copus to Pine, west on Pine to Fairground Road, north on Fairground Road to Park Road 269.

*Rusk*—Begin at the intersection of Wadley and Midkiff Road, west on Wadley and its extension to FM Road 1369, south on FM Road 1369 to State Highway 158, east on Highway 158 to Golf Course, east on Golf Course to Midkiff, north on Midkiff to Wadley.

*South*—Begin at the intersection of Fairground Road and East Highway 80, west on East Highway 80 to Cotton Flat Road, south on Cotton Flat Road to Interstate 20, east on Interstate 20 to State Highway 349, north on Highway 349 to Griffin Avenue, east on Griffin to the alley between South Terrell and South Dallas, north along that alley to East Indiana, east on Indiana to South Carver, south on Carver to Washington Avenue, east on Washington to South Benton, north on Benton to Indiana, east on Indiana to Fairground Road, north on Fairground Road to East Highway 80.

*Travis*—Begin at the intersection of South Carver and East Indiana, west on Indiana to the alley between South Dallas and South Terrell, south along that alley to its intersection with Griffin Avenue, west on Griffin to State Highway 349, south on Highway 349

to Interstate 20, east on Interstate 20 to the extension of South Lamesa Road, north along the east side of the extension of South Lamesa Road and Lamesa Road to its intersection with Cloverdale Road, east on Cloverdale Road to South Carver and north on South Carver to East Indiana.

*Washington*—This elementary school will be closed.

*West*—Begin at the intersection of East Wall and East Highway 80, west along Wall to West Highway 80, south from the intersection of West Wall and West Highway 80 to Interstate Highway 20, east on Interstate Highway 20 to Cotton Flat Road, north along Cotton Flat Road to Industrial Avenue, east on Industrial Avenue to South Dallas.

RACE ANALYSIS BY SCHOOLS
Projected Enrollment 1971–1972

| School | Negro American | Spanish American | Anglo American | Total |
|---|---|---|---|---|
| Bonham | | | 394 | 394 |
| Bowie | | 29 | 465 | 494 |
| Bunche | 158 | 37 | 160 | 355 |
| Burnet | | 58 | 452 | 510 |
| Crockett | 203 | 228 | 12 | 443 |
| De Zavala | 56 | 300 | 5 | 361 |
| Emerson | | 3 | 542 | 545 |
| Fannin | | | 564 | 564 |
| Henderson | 4 | 6 | 406 | 416 |
| Houston | | 3 | 417 | 420 |
| Jones | | 10 | 485 | 495 |
| Lamar | 5 | 15 | 388 | 408 |
| Long | 18 | 22 | 408 | 448 |
| Milam | 197 | 171 | 86 | 454 |
| Pease | 296 | 80 | 4 | 380 |
| Rusk | | | 543 | 543 |
| South | 175 | 157 | 205 | 537 |
| Travis | 131 | 189 | 155 | 475 |
| West | | 30 | 304 | 334 |
| Total Elementary | 1234 | 1347 | 5995 | 8576 |
| Alamo | 139 | 98 | 869 | 1106 |
| Goddard | 131 | 121 | 850 | 1102 |
| San Jacinto | 55 | 136 | 631 | 822 |
| Austin | 98 | 87 | 760 | 945 |
| Edison | 86 | 67 | 544 | 697 |
| Lee | | | | |
| 10 | 81 | 66 | 681 | 828 |
| 11 | 78 | 63 | 684 | 825 |
| 12 | 24 | 18 | 683 | 725 |
| MHS | | | | |
| 10 | 59 | 71 | 544 | 674 |
| 11 | 53 | 61 | 511 | 625 |
| 12 | 109 | 81 | 445 | 635 |
| SpEd | 8 | 5 | 18 | 31 |
| Total Secondary | 921 | 874 | 7220 | 9015 |
| TOTAL | 2155 | 2221 | 13215 | 17591 |

## II. *Transportation Policies*

Transportation will be provided for pupils residing outside the city limits who live two or more miles from school and for certain special education students—blind and partially sighted, deaf and hard-of-hearing, and trainables.

For students residing within the city limits and enrolled in regular school programs, transportation shall be made available where the pupil resides two miles or more, as measured by the nearest practical route, from the school to which he is assigned.

No student shall be required to ride on school-owned transportation vehicles. Parents may, at their own expense, provide transportation for students to the schools to which they are assigned.

Assignment of Rural Pupils by Bus Routes
1971–1972

| Bus | Elementary | Grades 7–8 | Grade 9 | Grades 10–12 |
|---|---|---|---|---|
| 1 | Burnet | Alamo | Edison | MHS |
| 2 | Burnet | Alamo | Edison | MHS |
| 3 | West | | | |
| 4 | Bunche | Alamo | Edison | MHS |
| 5 | Bunche | Alamo | Edison | MHS |
| 6 | Bunche | Alamo | Edison | MHS |
| 7 | | San Jacinto | Edison | MHS |
| 8 | Jones | Alamo | Edison | MHS |
| 9 | Bunche | Alamo | Edison | MHS |
| 10 | Bowie | San Jacinto | Edison | MHS |
| 11 | Burnet | Alamo | Edison | MHS |
| 12 | Burnet | | | |
| 26 | Emerson | | | |
| 27 | | Goddard | Austin | Lee |
| 28 | | Alamo | Edison | MHS |

## III. *Pupil Transfer Policies*

The pupil transfer policy is amended to read: "Such transfers shall be made without regard to race or national origin, and for the following reasons: (1) *physical handicap*, (2) *admission of a member of the family into a special education class at a special education center*, (3) *courses not offered in the attendance zone of residence*, (4) *graduating seniors*." Individual appeals not covered by the amended transfer policy will be considered by the Board of Trustees meeting in regular session.

1. Physical Handicap

    A physical handicap may make extremely difficult the attendance at the school serving the zone in which the student resides.

    Illustrative of such handicaps would be: a physical impairment which would make it most difficult or impossible for a pupil to climb stairs to classes on a second floor, a heart condition would be aggravated by climbing stairs or walking long distances to school, or students confined to a wheel chair whose classes would include those scheduled for a second floor. A request for transfer based upon a physical handicap must include a certificate signed by a medical doctor attesting to the extent of the physical handicap.

2. Admission of a Member of the Family into a Special Education Class at a Special Education Center

    An illustration of such a situation would be one in which the admission of a member of the family into a special education class would make desirable the admission of another member of the family into that school for purposes of assisting the student assigned to the special education class to get to and from school. Such a transfer request would be approved only if the receiving school had sufficient space to accommodate this student in the class in which he would be enrolled.

3. Courses Not Offered in the Attendance Zone of Residence

    Pupils may be transferred from one attendance zone to another if a course desired by the pupil is not offered in the school in the zone of residence but is offered in the school of another zone. Such transfers shall be rescinded should the pupil complete or withdraw from the course for which the transfer was granted.

4. Graduating Seniors

    A transfer may be granted to a pupil who has completed Grade 11 but whose residence has changed before graduation from high school. Such a transfer shall be made only to the school in the pupil's former zone of residence and from which the pupil wishes to graduate.

IV. *Assignment of Professional Personnel, 1971–72.*

| School | Negro-American | Mexican-American | Anglo-American | Total |
|---|---|---|---|---|
| Elementary | | | | |
| Bonham | | | 17.5 | 17.5 |
| Bowie | | | 21.5 | 21.5 |
| Bunche | 4 | | 13.5 | 17.5 |
| Burnet | 2 | | 19.5 | 21.5 |
| Crockett | 6 | 1.5 | 13 | 20.5 |
| DeZavala | | 7 | 11.5 | 18.5 |
| Emerson | | | 22.5 | 22.5 |
| Fannin | | | 21.5 | 21.5 |
| Henderson | | | 17 | 17 |
| Houston | 2 | | 16.5 | 18.5 |
| Jones | | | 19.5 | 19.5 |
| Lamar | 1.5 | .5 | 16.5 | 18.5 |
| Long | | 1 | 26.5 | 27.5 |
| Milam | 3.5 | | 16.5 | 20 |
| Pease | 2.5 | | 15.5 | 18 |
| Rusk | | | 21.5 | 21.5 |
| South | 3 | | 21.5 | 24.5 |
| Travis | 3 | | 19 | 22 |
| West | .5 | | 13 | 13.5 |
| Secondary | | | | |
| Alamo | 6 | 2 | 35 | 43 |
| Goddard | 2.5 | 2 | 45.5 | 50 |
| San Jacinto | 6 | 4 | 31 | 41 |
| Austin | 6.5 | 1 | 45.5 | 53 |
| Edison | 5 | 2 | 31 | 38 |
| Lee | 5 | 2 | 104 | 111 |
| Midland | 5 | 2 | 98.5 | 105.5 |
| | 64 | 25 | 734 | 823 |